*J. & W. L. Harlan* for plaintiff.

---

## Burdett, &c. *vs* Clay, &c.

ERROR TO THE MADSON CIRCUIT.

*Mortgages. Liens. Assignment of mortgage debts.*

CHIEF JUSTICE MARSHALL delivered the opinion of the Court.

On the 20th day of August, 1840, William Myers executed a mortgage, which was recorded on the day of its date, upon 500 acres of land, to Nelson Burdett, Wm. Hoskins, John Rout and Abram Smith, to secure the payment of several bills of exchange to the amount of $12,000, payable in New Orleans, which they had endorsed and which he proposed to negotiate at any or several of the Banks of Kentucky. On the 10th day of

*[margin:]* BURDETT, &c. *vs* CLAY, &c.

CHANCERY

8m 287
90 114

8m 287
100 234

8bm 287
109 405

*Case 71.*

*January 28.*

Case stated in the bill and amended bill.

October, he executed a second mortgage, recorded on the 13th, on the same land and several slaves, to Isaac M. Myers, Wm. Hoskins, R. P. Letcher and J. H. Letcher, to secure a debt of $701, due to R. P. Letcher, and to secure the payment of several specified debts in which one or more of the other mortgagees, (except R. P. Letcher,) were his sureties. On the 30th of December, 1840, he executed a third mortgage, recorded on the 5th of March following, on the same land, to C. M. Clay, to secure a debt of $6,000 due two years afterwards. This note was assigned to B. J. Clay, who in January, 1843, filed his bill for foreclosure, &c. against the mortgagor and last mortgagee alone. He afterwards filed amended bills noticing the first and second mortgages and bringing the mortgagees therein before the Court, but making no other parties. He alledges that the bills of exchange referred to in the first mortgage, if ever negotiated, had been paid without loss to the endorsers, and that the debts mentioned in the second mortgage had been paid without loss to the sureties, and calls for specific statements on the subject.

The answer of the first mortgagees states that the mortgage was made to secure them as endorsers of several bills of exchange drawn by Wm. Myers and payable in New Orleans; that one of said bills of exchange for $4,000, dated 29th of August, 1840, &c., and negotiated at the Danville Branch, &c., was paid by Myers, and goes on to say, "another bill of exchange was negotiated at same branch, which was not met at maturity, but the same, with costs of protest and interest, amounting to the sum of $4,074 40, (excepting a small portion paid by Wm. Myers,) was on the 17th day of November, 1842, paid off by the mortgagees," &c. &c. "Another bill of exchange for $4,000, was, on the 24th of August, 1840, drawn by Wm. Myers and endorsed by the mortgagees and negotiated at the Richmond branch, which was not met at maturity," &c., but a part of which being unpaid by Wm. Myers, the mortgagees had paid, &c. The sums paid by the mortgagees on the two bills, are specified, and denying that they had any other indemnity or means of payment or reim-

The answer of the first mortgagees.

bursement, except in the mortgage, they pray for a fore-closure.

In a subsequent amended bill many interrogatories are put to the several defendants with regard to the condition of the various debts in which they were interested, and as to the manner and means of their payment, and the first mortgagees are called upon to exhibit the bills of exchange referred to, but there is no suggestion in any pleading on the part of the complainant, that the bills which had been referred to in the answer, and those afterwards filed were not the identical bills referred to in the mortgage. The three bills exhibited in the record all bear date after the date of the mortgage, two of them in the same month of August, 1840, and the other as late as September, 1841. An amended answer and cross bill filed by one of the mortgagees and admitted by the others who were defendants thereto, states that the three bills were endorsed by the mortgagees in blank, with nothing but the sum, "$4,000," at the top of each in figures, and in that condition delivered to the mortgagor as soon as the mortgage was acknowledged. And this fact is proved by two witnesses. The same answer alledges that the bills afterwards remained in the possession of the mortgagor until they were negotiated at bank, and the dates then filled, &c.; which is also proved by the mortgagor who identifies the three bills exhibited as being the same which were endorsed at the date of the mortgage, and referred to and intended to be secured thereby.

The entire mortgaged estate was sold during the progress of the cause, and the proceeds having been considerably less than the aggregate amount of the debts claimed to be secured by the several mortgages, the Court, by its decree, postponed the claim of the first mortgagees, so far as it was founded on the bill of September, 1841, and also postponed several of the claims under the second mortgage on account of changes made in the debts therein mentioned, and gave precedence to Clay's demand before these postponed claims.

To reverse this decree the first mortgagees prosecute a writ of error, the other postponed parties assign cross

*Margin notes:*

BURDETT, &c.
*vs*
CLAY, &c.

Second amended bill making mortgagees in two prior mortgages parties.

The mortgaged effects sold and decree distributing the funds which is sought to be reversed.

BEN. MONROE'S REPORTS.

errors, and Clay also complains by cross errors, that his debt was not sufficiently preferred, and that too large a credit was allowed upon it.

The decree decides that Clay's mortgage, though not recorded nor lodged for record until after the expiration of sixty days from its execution, took effect as a recorded instrument from the time it was lodged for record, and was then notice to the senior mortgagees and all others. But although this question has been argued, we do not consider its decision necessary in the present case, because conceding that the recording of the third mortgage, whenever done, was constructive notice of the lien thereby created, this notice could only operate upon rights subsequently acquired or attempted to be acquired in the mortgaged property, and could not cut down any previous lien then existing, nor impose any active duty on the prior mortgagees, to be performed by them for the benefit of the junior mortgagee. Actual notice of a junior mortgage, though it might require greater caution in the exercise of his rights by the senior mortgagee, could not restrict them, further than to postpone any new liens or burthens attempted to be placed by them upon the estate, though under the authority of the first mortgage, and to require good faith with respect to the old ones. But if the junior mortgagee may, to any extent, insist upon the effect of recording his mortgage as notice to the senior mortgagee, much more must he be bound to notice the senior mortgage, which being duly recorded is valid against all subsequent incumbrances. We do not understand, however, that mere constructive notice, though it operates upon the rights of parties, is regarded as affecting the conscience.

The real questions with regard to the first mortgage <span style="margin">Questions arising in the case.</span> are: 1st. Whether it was in its inception, a valid security for the bills referred to. 2d. Whether these bills exhibited are the identical bills secured by that mortgage; and, 3d. Whether the mortgagees have, by their acts or omissions, lost the benefit of the security.

1. The mortgage describes the land conveyed so as to leave no room for doubt or question. It fixes the extent of the indemnity, viz: $12,000. It states the nature of

the liability to which the indemnity is to apply, and it shows that this liability is to arise by the future negotiation of the bills, or some of them, by the mortgagor.

In the case of *Nelson's heirs* vs *Boyce*, (7 *J. J. Marshall*, 401,) a recorded mortgage to indemnify against future securityships, to be undertaken by the mortgagee at the request of the mortgagors, was held to be valid and to afford effectual indemnity for a future securityship entered into after the mortgagor had sold the estate to another, but without actual knowledge of that fact by the mortgagee. In the case of *Thornton, &c.* vs *Knox's heirs*, (6 *B. Monroe*, 74,) it was decided that a recorded deed of absolute conveyance, reciting the consideration as paid or secured to be paid, without specification of the sum remaining unpaid, or of the time or times of payment, was a sufficient evidence of a lien to bind the land in the hands of a subsequent purchaser.

Under the authority of these cases we cannot doubt, that this mortgage was sufficiently certain to create and sustain the lien as an indemnity to the mortgagees. It was not necessary to state all particulars. It gave notice of the existance and extent of the lien and of the nature of the liability and of the persons concerned. It was sufficient to put the subsequent purchasers upon enquiry and to point out the means of knowledge. It was, therefore, sufficient, according to the principle of the cases cited, to sustain the lien against them.

. 2. With regard to the identity of the bills: the pleadings on the part of the mortgagees are not as specific as they might and should have been. But we think it sufficiently appears that they intended, in their first answer, to rely upon the three bills therein referred to as being the bills referred to in the mortgage, and that the bills filed by them upon the call of the complainant, are the same referred to in their answer. There being no suggestion on the part of the complainant of any question as to the identity of the bills, the want of more specific allegation on that subject by the defendant, should not preclude them from the benefit of the proof which they have made of the fact. And assuming that they have sufficiently alledged the identity of the bills,

BURDETT, &c.
vs
CLAY, &c.

The case of *Nelson's heirs* vs *Boyce*, (7 *J. J. Marsh.* 401,) & *Thornton* vs *Knox's heirs*, (6 *B. Mon.* 74,) cited and approved.

*mortgage*

A mortgage given to indemnify endorsers in three several bills of exchange for $4,000, endorsed in blank except the amount and delivered to mortgagee to be used to raise funds—Held to be valid.

BURDETT, &c.
vs
CLAY, &c.

it was certainly not incumbent upon them, (in the absence of any call upon the subject,) to account in their pleadings for the discrepancy in the dates of the bills and the date of the mortgage. This was involved in the question of identity, and was matter of evidence. Nor do we suppose that any presumption arising on the face of the mortgage, if there be such, that the bills intended to be secured bore the same or a prior date, could present any serious obstacle to the admissibility or effect of parol evidence identifying bills of subsequent date as being those referred to, and much less that so inconclusive a presumption could be relied on by the junior mortgagee as *per se*, excluding a bill of subsequent date from the benefit of the prior mortgage. The cases of *Honore's executor* vs *Bakewell*, (6 *B. Monroe*, 67,) *and Brinkerhoff, &c.* vs *Lansing. &c.*, (4 *Johnson's Chy. Rep.*, 65,) show that such discrepancy does not deprive the mortgagee of his indemnity, though it may render more difficult the identification of his demand as the one intended to be secured. But there is no discrepancy between the bills and the mortgage, because the mortgage does not describe the bills by date or time of payment. And there is no discrepancy even between the bills, and the presumption from the face of the mortgage, because considering the nature and evident object of the transaction, viz: the future negotiation of the bills by Myers, for his own accommodation, as he might have opportunity or occasion, the presumption would be at least as strong that the bills were not then dated as that they were. We have already said that the identity of the bills is proved, and we have no doubt they are the same intended to be secured by the mortgage and referred to therein.

3. The question of identity, and of exclusion from the benefit of the prior mortgage, on account of discrepancy in the date, is not seriously urged with respect to the bills dated in August, 1840, but only as to the bill dated and negotiated in September, 1841, after the recording of Clay's mortgage. As to which, it is contended that its negotiation after the endorsers had notice of Clay's mortgage by its being recorded, could give them

Mortgagees who
have endorsed
bills in blank,
and taken the
mortgage as an
indemnity, are
not affected by
subsequent mort-
gages upon the
same property,
though made be-

no new lien, or should, to the extent of their claim upon that bill, deprive them of their priority, if they had any under their mortgage, because they should not have permitted, but should have prevented its negotiation to the injury of Clay.

But as the first mortgagees, by delivering the bills with their names endorsed, incurred the liability of endorsers, contingent only upon the future negotiation of the bills by the mortgagor, for whose accommodation they were endorsed, and as this liability was a proper subject of indemnity, and was indemnified by the mortgage, they had a lien from the first to the full extent of this contingent liability; and it was no more enlarged by the subsequent negotiation of one of the bills which was the very contingency provided for, than it would have been enlarged by the non-payment of a bill which had been negotiated before the date of the mortgage, and was fully described therein as the subject of the indemnity. The entire estate was conveyed to them as an indemnity, &c. against the entire liability which they incurred by placing their blank endorsements in the hands of the mortgagee to be used by him. They could not call for nor enforce the indemnity until the bills should be not only negotiated but left unpaid at maturity. But they had, from the first, their lien to meet these contingencies, and it neither took date from nor was enlarged by them. They claim no new lien as arising upon the negotiation or non-payment of the last bill, but claim to enforce their original lien upon the contingency which it was intended to meet.

fore the bills are put into circulation, nor by the negotiation or putting into circulation of the bills so endorsed after the date of a second mortgage. They had no right to prevent the mortgagor from putting the bills into circulation.

There is not the slightest evidence that they co-operated in any manner, in the negotiation of this bill, or that they knew of it at the time, or that they knew what had become of it at any time before, or that they had any actual notice of the existance of Clay's mortgage. They had, with a satisfactory indemnity in their hands, endorsed and delivered the bills to the mortgagor to be negotiated for his accommodation. His payment of one of the bills and of nearly three fourths of another, had made the indemnity still more ample. We do not see that they had a right, much less that they were bound to

interpose either for their own safety or for the benefit of Clay, of whose interest they knew nothing, to prevent the negotiation of the bill by Myers. It would be strange indeed if the duty of restraining or preventing its negotiation, should have devolved upon them for the benefit of the junior mortgagee, when that mortgagee himself, with the means of knowing and with a presumed knowledge of the facts, had omitted all steps for that purpose, and did not even apply to them either for information or aid.

We do not concede the existance of any such obligation. The senior mortgagees were not bound thus to look to the protection of the junior mortgagee, and he had no right to expect them to do so. It was his business to take care of himself. They could not lose their advantage by the mere failure to act, at any rate for the short period of twelve or thirteen months. They could not have resisted their liability as endorsers upon the last bill, because it was not negotiated until thirteen months after the date of their mortgage. And whatever might have been the rights of the purchasers of that bill, the mortgagees who do not claim under the purchaser, but in their own original right, having done nothing which, in our opinion, amounts either to a waiver or cause of forfeiture, are entitled to their indemnity.

The memorandum upon the bills that proof of non-acceptance and non-payment is dispensed with, and that the protest shall be evidence of presentment, implies, in our opinion, that the protest shall be evidence of due presentment, as this is the only effect which the last clause of the memorandum could have. It was, therefore, unnecessary to adduce further evidence that three days of grace are allowed at New Orleans, which the protest made on the third day conduces to prove, independently of the memorandum. It follows, that the Court erred in postponing the claim of the mortgagees as founded on their payment of the bill dated in September, 1841, and that it did not err in giving them the precedence for their partial payment on the other bill.

We are also of opinion that the Court erred in post-poning the Hyatt debt and the Letcher debt of $701, secured by the second mortgage. That mortgage expressly secures the payment by the mortgagor, of the debts named therein. And although the changes made in the forms in which the debts were evidenced or secured, may have made their identity more questionable and more difficult to be traced, it does not deprive them of the lien so far as they can be and are actually identified. This is proved by the cases already referred to, of *Honore's executor* vs *Bakewell* and *Brinkerhoff*, &c. vs *Lansing*, &c.

The assignment of a note secured by mortgage, carries with it the mortgage lien, which certainly is not destroyed by a renewal of the note to the assignee, any more than by its renewal to the mortgagee or original payee. And the case is essentially the same, if instead of assigning the note first, the new note be taken and delivered to the intended assignee of the debt. It is still the same debt entitled to the same security. Nor can the security be lost by the mere fact of taking a new note with personal security. Such a fact has been supposed to destroy an implied lien, but not (so far as we know,) an express one by mortgage. The taking even of a second mortgage on different estate, is not impliedly a waiver of the first but only an additional security; and much more should the taking of mere personal security be so considered. There is no pre-sumption in such a case, of an intention to throw the burthen from the original debtor or his estate, upon the new security. And there is no evidence of such intention in the instances presented in this record. The Hyatt debt, therefore, remained secured though renewed by his request, to his son-in-law, and although G. F. Burdett became bound as surety in the place of J. H. Letcher, but together with the other surety, J. M. Myers, who was secured by the mortgage as surety for this debt. The debt was paid by Burdett, who sets up his claim in answer to the cross bill of J. M. Myers, by whom it is asserted for him, and J. M. Myers being secured by the mortgage, was entitled to be indemnified to the

BURDETT, &c.
*vs*
CLAY, &c.

When a mortgage is given to secure a particular debt, a change of the debt by taking a new note, does not deprive the mortgagee of the benefit of the mortgage security: *Honore's ex'r.* vs *Bakewell*, (6 B. Mon. 67;) *Brinkerhoff*, &c. vs *Lansing*, (4 John. Chy. Rep. 65.)

The assignment of a note secured by mortgage carries with it the mortgage lien, which is not destroyed by a renewal of the note, nor is it otherwise if a new note be taken payable directly to a third person—it is still the same debt. Nor does the fact that the personal security is taken destroy the mortgage lien.

full extent of the debt, which was also expressly secured. And as Clay, with notice of Burdett's interest and claim to be substituted to the rights of Myers, did not make him a party, but contested the claim with Myers, with whom Burdett also interpleaded, we are of opinion that the claim is sufficiently presented, and that it should have been allowed for the benefit of Burdett. Upon the pleadings and facts, Clay has no right to appropriate to his debt the indemnity secured to the Hyatt debt, and thus to throw the loss upon the surety who has paid it, evidently relying on this indemnity.

—Nor is the taking a second mortgage an implied waiver of the first, but is regarded as additional security. So is the taking of personal security.

The Letcher debt of $701, is expressly secured to him as mortgagee. And upon the foregoing principles the security is not lost by its renewal to himself and another as trustees, and with J. M. Myers as surety. This debt should, therefore, have been preferred. For the same reason there was no error in preferring the White debt and the Shanks debt, secured by the second mortgage, and of which the form had been somewhat changed. The mortgage gave notice of all these debts, and the subsequent mortgagee might, by reasonable enquiry, have ascertained their non-payment and also their exact form, if he had desired it. The decree is, however, erroneous to the prejudice of Clay, in crediting his debt by the sum of $250, as made by attachment, when he only admits a smaller sum, and there is no evidence of the larger one. On the return of the cause the fact should be enquired into, and the error, if it be one, should be corrected. But this is an error as between Clay and Wm. Myers only, not affecting the other mortgagees.

Wherefore, the decree is reversed upon the original errors and also upon the cross errors of J. M. Myers and G. F. Burdett, as to the Hyatt debt, and upon the cross errors of R. P. Letcher as to the debt of $701, and on the cross errors of Clay as to the credit decreed on his demand, and the cause is remanded with directions to render a decree as herein indicated.

*B. & A. Monroe, J. & W. L. Harlan and Ballinger* for Burdett, &c.; *Caperton and Dunlap* for Letcher, &c.; *Turner* for Clay.